Filed 9/23/14  P. v. Williams CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DONTRELL WILLIAMS,<br><br>    Defendant and Appellant. | B245238<br><br>(Los Angeles County<br>Super. Ct. No. BA374034) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Affirmed as modified.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Dontrell Williams appeals from a judgment of conviction entered after a jury trial. By information filed December 21, 2010 the People charged Williams and his mother, Dunya Wade,[1] with making a criminal threat (Pen. Code, § 422;[2] counts 1 (Williams) & 2 (Wade)), assault with a firearm (§ 245, subd. (a)(2); counts 3 & 4), and assault with a semiautomatic firearm (§ 245, subd. (b); count 7). The People also charged Williams with possession of a controlled substance, cocaine base (Health & Saf. Code, § 11350, subd. (a); count 5), and a third count of assault with a firearm (§ 245, subd. (a)(2); count 6). The information further alleged as to count 3 that Williams personally inflicted great bodily injury on his victim (§ 12022.7, subd. (a)) and as to counts 4 and 6 that Williams personally used a firearm in the commission of the crimes (§ 12022.5, subd. (a)). Finally, as to counts 1, 2, 3, 4, and 7, the information alleged the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

The jury found Williams guilty on count 1 of making a criminal threat, on counts 4 and 6 of assault with a firearm, and on count 5 of possession of a controlled substance. As to count 6, the jury found true the allegation Williams personally used a firearm in the commission of the crime. The jury deadlocked on the remaining counts and allegations. The trial court declared a mistrial as to those counts and allegations, and essentially dismissed them.[3]

---

[1] Wade is not a party to this appeal.

[2] Undesignated statutory references are to the Penal Code.

[3] The court stated, "I think it's within my discretion to dismiss those counts. I will not permit the D.A. to retry them." When asked whether the court was dismissing the special allegations, the court stated, "I don't know—by operation of law they must be" dismissed.

The trial court selected count 4, assault with a firearm, as the principal term and imposed the middle term of three years. The court stayed the sentence on count 1 pursuant to section 654, imposed a concurrent sentence of the low term of one year and four months on count 5, and imposed a consecutive sentence of one year (one-third the middle term of three years) for the second assault with a firearm, count 6. The court imposed an additional lower term of three years on count 4 for the enhancement under section 12022.5,[4] for a total term of seven years in state prison.

Williams contends that the trial court committed several evidentiary and sentencing errors. We agree with his claim of sentencing error, modify the sentence accordingly, and otherwise affirm.

## FACTUAL BACKGROUND

A.      *Count 6—Assault With a Firearm*

At 2:00 a.m. on May 23, 2010, Gajdron Peppers went to see his girlfriend, who was Williams' cousin, at Wade's apartment on Tacana Street in Los Angeles. Peppers entered a bedroom and saw Williams having intercourse with a woman. He said he was sorry, shut the door, and went outside to the parking lot.

Williams came out about 20 minutes later. Peppers walked up to him to shake his hand. Williams took out a gun and struck Peppers in the eye with the butt of the gun. Williams continued to hit Peppers in the face and head while Peppers kept telling him to stop. Williams said he was going to mess Peppers up.

Wade came out and stopped Williams. But then she slapped Peppers on the head, and told him she did not like him and he should not come to her apartment anymore.

---

**4**      As we discuss, the trial court erred in imposing enhancements on count 4 rather than count 6.

Peppers walked home. His eyes were swollen shut. He called 911 three times. An ambulance arrived, and the paramedics took him to a hospital, where he received treatment.

Sharyn Nolan lived in the same apartment building as Williams and Wade. When she arrived home at about 2:00 a.m. on May 23, 2010, she saw Williams and Peppers fighting. Neither one had a gun. When the fight ended, Peppers walked away. Peppers "kept hollering at" Williams that Williams owed him money.

B.      *Counts 1 to 4, 7—Making a Criminal Threat, Assault With a Firearm, Assault With a Semiautomatic Firearm*

Bob and Mary Ampofo lived with their five children in the same apartment building as Williams and Wade. On the afternoon of July 23, 2010 Mary Ampofo and four of the children were bringing home groceries. After Mary put her groceries down in her apartment she went outside to see why the children had not come into the apartment. They told her the police had come into the courtyard and asked if they saw anyone running through.

Los Angeles Police Officers Robert Smith and Brent Williams went to the Tacana Street apartment building in response to a call regarding a burglary suspect. They saw the suspect with a group of people. When he saw the officers, he ran into the courtyard of the building. The officers went into the courtyard and asked the children if they saw anyone run through the courtyard. Two of the children pointed to Wade's apartment.

The officers went upstairs to Wade's apartment and had the children verify that it was the right one. The officers knocked on the door and Sasha Freeman, who was holding a baby, answered. The officers said they were looking for suspects who had run from them and the officers believed they had run into the apartment. Freeman said she was babysitting and was not allowed to let anyone into the apartment. The officers asked if there was anyone in the apartment with her, and she said she was the only one there. The officers asked if they could come inside and look around, and she again refused to let them in.

4

The officers requested additional units. Freeman called Wade to tell her what was going on, and Wade told Freeman not to let anyone inside the apartment. Officer Smith told Freeman to tell Wade that they had a legal right to enter the apartment and that, if necessary, they would remove the door to gain access. Freeman still refused to let them in.

As the officers were preparing to remove the door, Gregory Thompson opened the door and let them in. Williams and Gary Jetter were also in the apartment. Williams told the officers that his name was "Isaiah Wheeler." Officer Smith knew Isaiah Wheeler and that he was a member of the Black P Stone gang.[5] Thompson and Jetter were also members of the Black P Stone gang. The officers handcuffed the three men and detained them in front of the apartment building. Wade then arrived at the building and began yelling at the officers. She said the apartment was hers, and "Isaiah Wheeler" and Thompson were her sons. The officers did not locate the burglary suspect and eventually left.

An hour later, Wade and two or three other women went to Mary Ampofo's apartment. Wade asked why Mary had allowed her children to talk to the police. Wade was angry, and she screamed and cursed at Mary. She warned that if Mary's children spoke with the police again, she would have her people come after Mary's family. Wade told Mary that her family was in danger, and she told Mary's oldest son that his life was especially in danger. Mary recalled Wade saying, "you don't know where I'm from, I'm BPS fucking bitch. If you talk to the police about me again, I will let my people come after you." Mary and her children were afraid, and the children were crying. Mary called her husband and told him to be careful in the parking lot when he came home.

---

[5]     A gang expert, Officer Eduardo Garcia, testified regarding gang activity in general and the Black P Stone gang in particular. He noted that the Black P Stone gang was sometimes identified as "BPS." He also stated that the Tacana Street apartment building is within Black P Stone territory. He identified Williams as a member of the Black P Stone gang.

Bob Ampofo came home at about 8:00 p.m., and Mary told him what had happened. The two of them went to Wade's apartment and knocked on the door. Wade came to the door. Mary asked Wade, "Please let it go. We don't have nothing against you guys. . . . Trust me the kids are scared and everything and we don't have nothing against you. All of us live here." Wade responded that Mary's children should not have talked to the police and that people would come after her and her children.

Wade yelled at Mary, "bitch motherfucker, why did you bring your husband here?" Mary explained that because Wade had said her whole family was in danger, she came with her husband to apologize. Wade then turned to Bob and asked why he was there. Bob responded, "[Y]ou can't ask me that. They are my children and they are my family so I have to come with my wife and apologize to you because you said the whole family."

Wade came out and began to push Bob. Mary told her, "Neighbor, we are not here to fight." Mary then told Bob they should go. Wade slapped Bob. Another woman came out of the apartment and began hitting Bob. Bob fell back and his hand hit a window, breaking it. He landed face down on the ground, and Wade began kicking him. She then jumped on top of him and hit him with her fist. Bob reached up and grabbed her hair.

Williams came out of the apartment and hit Bob with a chair. He stomped on Bob's head and back. Two other men came over and joined in the attack. Williams hit Bob with a cooking pot. Bob heard someone yelling, "Kill that motherfucker." Mary was yelling "stop" and "help." Bob told her to call the police. She pulled her cell phone out of her pocket and called 911. The phone fell to the ground. Bob heard the operator on the line. Bob told the operator that "they" were killing him and gave her the address.

Williams ran downstairs. Wade and the others began dragging Bob down the stairs. Williams returned with a gun. He pointed it at Bob's head and said he was going to kill him. Wade then told Williams to leave because Mary and Bob had called the police. Williams ran away. The other two men then left.

6

Los Angeles Police Officers Joseph Getherall and Ulises Hernandez arrived at about 10:10 p.m. They saw Wade standing over Bob, screaming, "motherfucker you got what you deserved." Bob was lying on the ground. He had lacerations on his body, his eye was swollen, he was bleeding from his nose and mouth, and he was having difficulty getting up. Officer Hernandez called for an ambulance. Paramedics arrived and took Bob to the hospital.

Officer Getherall observed that Mary "appeared to be distraught and in fear." Mary "had tears in her eyes. She was shaky. She was trembling. What anybody would feel like when being threatened with their life." Officer Getherall spoke to Mary, who said that Wade had told her she "fucked up by having her children contact the police. [Wade] advised her that in the jungles you don't do that, you don't talk to the police in the jungles."[6] Mary also told Officer Getherall that Wade had said to her, "I don't need to tell you where my family is from . . . , but if you don't know it's BPS bitch."

Mary's five children were with her during the interview. According to Officer Getherall, her "older son appeared to be upset, and the [other] four children, I believe, were crying and distraught." Officer Getherall "attempted to console them and told them that it would be okay, I'm going to make sure I put these people in jail."

After Officer Getherall spoke to Mary, the officers took Wade into custody. Wade was upset and irate, but she did not appear to have any injuries.

Bob was treated at the hospital and released a few hours later. The Ampofos spent the night at a motel. They returned to their apartment the next day, packed their things, and left. They did not return to the apartment.

Wade's version of the events of July 23, 2010 was different. Wade testified that her babysitter called to say that the police were banging on the door and demanding that

---

**6** "The jungles" is in the Lower Baldwin Village area of Los Angeles. It is located between Exposition Boulevard on the north and Stocker Street on the south, La Cienega Boulevard on the west and La Brea Avenue on the east. It consists mainly of apartment buildings. (See *Jackson v. Harrington* (C.D.Cal. 2011) 2011 WL 7143189 at p. 5; *Jordan v. Neotti* (C.D.Cal. 2011) 2011 WL 1532059 at p. 4.)

7

she open it. Wade asked if they had a warrant. The babysitter said no. Wade said she was on her way home.

When Wade arrived home, she tried to go upstairs to her apartment, but an officer told her "to get [her] ass back down the stairs." She went downstairs and waited. The officers brought Williams downstairs. Wade kept trying to find out what was going on. Eventually, the officers released Williams. Wade spoke to a sergeant who apologized for the officers' conduct and explained that the officers had been looking for suspects in an earlier incident but Williams was not a suspect. When Wade went upstairs to her apartment, she discovered that it "was kind of tore up," with furniture overturned, drawers opened, and items strewn about.

Wade asked Williams about what had happened, and he said he was in bed. Wade was not sure if he was telling the truth, so she went to the Ampofos' apartment to ask Mary if she knew what happened. Mary said that the police had gone to Wade's apartment and searched it. Mary said she was sorry, her kids had pointed out Wade's apartment, and it would not happen again. Wade told her it was okay, they were neighbors and they had to get along. Wade then went back to her apartment.

Wade testified that two or three hours later, there was a knock on her door. Mary and Bob Ampofo were at the door. Mary said they needed to talk, they were neighbors, and they needed to get along. Wade agreed. As Mary started to introduce Bob as her husband, Bob shoved her out of the way and said to Wade, "You, you bitch, you bitch, you don't talk to my wife." Wade was caught off guard and began backing up into her apartment. Bob pursued her, pointing at her and telling her not to talk to his wife. Bob hit Wade on the side of the face and grabbed her hair, and she fell to the floor. Bob continued to hit her, and he dragged her out of the apartment. Wade yelled for her son to call the police. She heard Mary tell Bob, "We didn't come here for this."

Bob suddenly released his grip on Wade, and she saw Williams fighting with him. Wade got up, ran back into her apartment, and locked the door. When she looked outside, she saw Bob walking downstairs, followed by Mary and Williams. Wade went outside and started to go downstairs to see if Williams was alright. Bob started back up

8

the stairs, saying, "Fuck you, bitch. I'm going to get you. I'll be back. I got guns. I'll do this to you." Wade went back up the stairs. Wade did not observe any other men involved in the fight, did not see Williams hit Bob with a chair or a cooking pot, and never saw William possess or threaten to shoot Bob with a gun.

According to Wade, once the police arrived, Bob lay down on the ground "like if he was the victim or something." She went downstairs and told the police that Bob attacked her. An officer had Bob stand up and placed him in handcuffs. Mary interrupted and said that was not what happened. Then the officers arrested Wade.

Wade was released on bail the following morning. She returned to the police station two days later and told them she was the one who had been assaulted, and it was her son who had called 911. The officer continued to ask her about Williams and whether he was the one who had assaulted Bob.

Other witnesses corroborated Wade's version. Stephany Brown testified that on the evening of July 23, 2010, she was in Wade's apartment with Wade, Williams, and Wade's 10-year-old son, D'Won McCarthy. Mary and Bob came to the door. As Mary introduced Bob, he pushed her aside "and then he got very derogatory and very boisterous." He called them "bitches" and "hoes," and he stuck his finger in Wade's face. Wade started backing up, and Bob slapped her. Wade tripped and fell, and Bob kept hitting her and pulling her hair. Wade yelled for someone to call the police.[7] Brown then observed Bob drag Wade out the door. Brown and Mary stepped in to try to get Bob off of Wade. Mary kept saying, "We did not come up here for this, what are you doing. Let her go." Bob told Mary to shut up and tried to push her and Brown away. Williams had been in the kitchen cooking. He came out and tried to push Bob off of Wade. When that did not work, he fought with Bob. After two or three minutes, Williams and Bob "just left." Bob went downstairs and "just laid down in the middle of the compound."

---

[7] D'Won testified that he called 911 twice because Bob was going to hit his mother and his mother told him to call the police.

9

Fourteen-year-old B.M. lived in the same apartment building. She testified she heard a lot of noise that evening and went outside. She saw Bob on top of Wade, pulling her hair and punching her, and she heard Wade calling for help. Brown tried to pull Bob off of Wade but was unable to do so. After that, Williams came out and tried to pull Bob off of Wade, and the two men began fighting. B.M. did not see any other men join in the fight, she did not see Williams hit Bob with a chair or cooking pot, and she did not see Williams with a gun. B.M. testified that after the fight Williams, Bob, and Mary went downstairs. Bob sat on the bottom stair and kept saying he was going to come back. Mary put her hand over his mouth, and he kicked her. Then the police arrived.

Ashley Brady, who was talking with a friend in the courtyard of the Tacana Street apartment building on July 23, 2010, saw Wade go downstairs to the Ampofos' apartment and overheard Wade and Mary speak cordially and in conversational tones. Brady did not hear Wade make any threats.

### C.     *Count 5—Possession of a Controlled Substance*

Officers Getherall and Hernandez returned to Wade's apartment a couple of hours later because they believed additional suspects might be there. Williams was in the apartment with four other people. The officers asked them for identification. Williams did not have any but identified himself as "Isaiah Wheeler." Officer Getherall knew he was lying, because he had met Williams before and knew Williams was not Isaiah Wheeler. Officer Getherall also recognized Williams' tattoo: "a Crip Killer tattoo on his back which is a CK with the C crossed out."

The officers arrested Williams and took him to the police station for booking. There, Williams removed a plastic bindle containing rock cocaine from his anus and told Officer Hernandez, "Fuck it, you got me already."

10

**DISCUSSION**

A.     *Officer Getherall's Statements Suggesting Williams Was Guilty*

Williams contends that Officer Getherall's "repeated expression of his opinion that [Williams] was guilty" deprived him of his constitutional rights to a jury trial and a fair trial. The "repeated expression" to which Williams refers consists of two statements. Officer Getherall testified that he "attempted to console" Mary's children "and told them that it would be okay, I'm going to make sure I put these people in jail." Officer Getherall also testified that Mary "appeared to be distraught and in fear," and "had tears in her eyes. She was shaky. She was trembling. What anyone would feel like when being threatened with their life."

Counsel for Williams did not object to the statement about putting "these people in jail." Therefore, to the extent Officer Getherall's statement to Mary's children that he was "going to make sure I put these people in jail" was an expression of his opinion of Williams' guilt, Williams' failure to object to the statement forfeited his argument that the trial court erred by admitting it. (See Evid. Code, § 353; *People v. Edwards* (2013) 57 Cal.4th 658, 709 [failure to object to witness' opinion that the victim's injuries were painful forfeited contention the testimony was irrelevant "because the jury could draw its own conclusions"]; *People v. Hamilton* (2009) 45 Cal.4th 863, 917 [failure to object to "improper opinion of a lay witness . . . forfeited the claim for appeal"].)

Counsel for Williams did object to the statement about Mary feeling threatened with her life and moved to strike it. The trial court overruled the objection, stating, "He's a seven year veteran of the police department. I am sure he's investigated many incidents. I'll allow him on lay opinion to give that testimony." We review the trial court's ruling on the admission of lay opinion testimony for abuse of discretion. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1254.)

"'A witness may not express an opinion on a defendant's guilt.'. . . [Citations.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) Such "'opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another

11

way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

A lay witness may give opinion testimony only if it is "(a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.) "'"[A] lay witness may testify in the form of an opinion only when he cannot adequately describe his observations without using opinion wording."' [Citation.]" (*People v. Callahan* (1999) 74 Cal.App.4th 356, 380; accord, *People v. DeHoyos* (2013) 57 Cal.4th 79, 130.) This may occur "'"'where the concrete observations on which the opinion is based cannot otherwise be conveyed,'"'" or where "a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on 'subtle or complex interactions' between them . . . ." (*DeHoyos*, *supra*, at p. 130.) "'Where the witness can adequately describe his observations, his opinion or conclusion is inadmissible because it is not helpful to a clear understanding of his testimony.' [Citations.]" (*Callahan*, *supra*, at p. 380.)

It is not clear that Officer Getherall's statement about Mary looking like someone who was fearing for her life was an opinion of Williams' guilt, or that the jurors would have understood it as such a statement. There was no evidence that Williams threatened Mary, and he was not charged with making a criminal threat against her. It was his mother, Wade, who threatened Mary. The statement may have suggested that Wade was guilty of a crime, but it did not suggest Williams was. Nevertheless, Officer Getherall's statement was inadmissible, the trial court abused its discretion in overruling the objection, and the court should have granted Williams' motion to strike it. Officer Getherall was able to describe Mary's demeanor and appearance, and to convey his "'"'concrete observations'"'" (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 130) about her appearance without giving his opinion that she felt like someone who had just had her life threatened. Nor did Officer Gethrall's impression of Mary rest on "'subtle or complex interactions'" (*ibid*.) between the two of them. She was a distraught witness and he was an officer responding to the scene and making observations of what he saw. His

12

statement that Mary appeared to be feeling "[w]hat anyone would feel like when being threatened with their life" was not necessary to a clear understanding of his testimony.

Any error in admitting the two statements by Officer Getherall, however, was harmless. The erroneous admission of evidence requires reversal of a judgment only where it is reasonably probable the defendant would have received a more favorable result had the evidence been excluded. (*People v. Carter* (2005) 36 Cal.4th 1114, 1152; *People v. Earp* (1999) 20 Cal.4th 826, 878; see *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 76 ["claim . . . of erroneous admission of evidence [is] subject to the standard of review for claims of state law" under *People v. Watson* (1956) 46 Cal.2d 818, 836].) Neither of Officer Getherall's statements mentioned Williams by name, explicitly expressed an opinion as to Williams' guilt, nor suggested that Officer Getherall had access to information not introduced at trial that established Williams' guilt. The fact that the jury convicted Williams on only some of the counts against him and found true only some of the special allegations further shows that the statements did not lead the jury to convict him. It is not reasonably probable the result would have been any different had the trial court excluded the lay opinion portion of the officer's testimony. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 84 ["[e]ven if there was error in admitting lay testimony, however, the error was harmless because it is not reasonably probable the jury would have reached a result more favorable to appellants had the error not occurred"]; see, e.g., *People v. Rogers* (2009) 46 Cal.4th 1136, 1167 [not reasonably probable defendant would have received a more favorable result absent witness' "brief mention that defendant broke into [the victim's] car to leave a note"]; *People v. Stewart* (2004) 33 Cal.4th 425, 494 [prosecution's case did not focus on brief references to an alleged plot to kill witness].)

Finally, contrary to Williams' assertion, any error from the admission of Officer Getherall's testimony did not deprive Williams of his constitutional rights "because this case falls within the general rule that 'violations of state evidentiary rules do not rise to the level of federal constitutional error.' [Citation.]" (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 120; see *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 751 ["[o]ur

13

Supreme Court has rejected the attempt to transform evidentiary claims into errors of constitutional proportion"].)

### B.   *Evidence of Prior Misconduct*

The gang expert, Officer Eduardo Garcia, testified that Williams had a tattoo of "a teardrop under his left eye," which is "commonly used when you've done prison time." He also testified that Williams had a tattoo of a "CK on his back with the C crossed out. The CK that stands for Crip Killer. . . .  Usually someone who puts a CK on there has earned it.  It means they've done a drive-by or they've killed a rival gang member or they've shot a rival gang member."  Williams argues that the trial court erred by admitting this evidence that Williams had served a prior prison term and had killed someone, and that by admitting this evidence in violation of Evidence Code section 1101, subdivision (a), the trial court deprived Williams of a fair trial.

Counsel for Williams did not object to any of this testimony.  As Williams concedes, the failure to object to the admission of this evidence generally forfeits the issue on appeal.  (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1208 [contention that "bad character evidence . . . was admitted in violation of Evidence Code section 1101" was forfeited by failing to object in trial court]; *People v. Maciel* (2013) 57 Cal.4th 482, 531 ["[b]ecause defendant did not object to the admission of the testimony on any ground," his claim of error in its admission was forfeited].)

The failure to object is excused where an "objection would have been futile and any request for admonition would have been inadequate to cure the harm.  'A defendant claiming that one of these exceptions [to the forfeiture rule] applies must find support for his or her claim in the record.  [Citation.]  The ritual incantation that an exception applies is not enough.'  [Citation.]" (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1239.) There is no indication in the record that an objection would have been futile.  (See *People v. Pearson* (2013) 56 Cal.4th 393, 425 [forfeiture rule applied where "[n]othing in the record suggests any objections or request for admonition would have been futile"].) Moreover, an admonition would have cured any harm.  Officer Garcia explained the

14

general or common meaning of Williams' gang tattoos. An objection and admonition to the jury could have limited the jurors' use of this evidence to the gang allegation and made it clear that the jurors could not speculate about whether Williams had personally served time in prison and killed someone. Therefore, Williams has forfeited his challenge to the admissibility of Officer Garcia's testimony. (Cf. *People v. Clark* (2011) 52 Cal.4th 856, 942 ["[b]ecause defendant failed to request a limiting instruction below, he has forfeited his claim that it was error for the court not to so instruct"]; *People v. Davis* (2005) 36 Cal.4th 510, 550 [defendant, by failing to request a limiting instruction that the jury could not consider out-of-court statements for their truth, "on appeal . . . may not complain of the lack of one"]; *People v. Lewis* (2001) 25 Cal.4th 610, 638 [by failing to request an instruction that uncharged crimes evidence was admissible "for the limited purpose of showing intent," defendant did not preserve the issue for appeal].)

In any event, "[s]ubdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted; see *People v. Spector* (2011) 194 Cal.App.4th 1335, 1373.) Williams concedes that "a prosecution gang expert may testify to a defendant's tattoos which are linked to gang membership," and that "Officer Garcia's testimony regarding [Williams'] tattoos was admissible to show [Williams'] gang membership." (See *People v. Valdez* (2012) 55 Cal.4th 82, 130-131 [evidence of gang tattoos is admissible under subdivision (b) of Evidence Code section 1101 where the charged crimes are gang-related].) Williams argues only that Officer Garcia went "too far" when he testified that Williams' tattoos signified that he had done prison time and killed a rival gang member.

Any error in admitting the portion of Officer Garcia's testimony that Williams asserts went "too far" under Evidence Code section 1101, subdivision (b), by describing

15

the meaning of Williams' tattoos, however, was harmless. Williams argues that this was a "close case," a credibility contest between the Ampofos and Peppers, on one side, and Wade and the defense witnesses, on the other side, and that Officer Getherall's statement helped "tipped the scale against [Williams] and led to the guilty verdicts." The record does not support Williams' argument. The jury convicted Williams on only some of the counts against him and found true only some of the special allegations. The verdict shows that the jury did not convict Williams merely because Officer Garcia testified that Williams had tattoos signifying he had been in prison and was a Crip Killer. The jury may have had some difficulty with the details of the incidents—the number of attacks on Bob and whether Williams used a firearm in each of the attacks—but the verdict shows that the jury "'considered the evidence [as to each count and special allegation] dispassionately in reaching its verdict.' [Citation.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 370; see *Park v. California* (9th Cir. 2000) 202 F.3d 1146, 1150 [fact that the jury did not convict defendant on all counts is "strong evidence that he was not prejudiced by the admission of evidence"].) Moreover, the case was not that close. The police officers corroborated the Ampofos' testimony by testifying about their observations that Bob had injuries and Wade did not. It is not reasonably probable the jury would have acquitted Williams on all counts had Williams objected to the tattoo evidence and the trial court excluded it. (See *People v. Welch* (1999) 20 Cal.4th 701, 749-750 [standard for whether evidence admitted in violation of Evidence Code section 1101 is prejudicial is whether it is "reasonably probable that a result more favorable to defendant would have resulted absent admission of this evidence"]; *People v. Lopez* (2011) 198 Cal.App.4th 698, 716 ["error in admitting Evid[ence] Code[ section] 1101 evidence [is] tested by [the] *People v. Watson*[, *supra*,] 46 Cal.2d [at p.] 836 . . . harmless error standard"].)[8]

---

[8]     As we did with the admission of Officer Getherall's statements, we conclude that the admission of Officer Garcia's statements did "'not rise to the level of federal constitutional error.' [Citation.]" (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 120.) Nor do we find cumulative error. As noted, the verdict shows that the jurors made a careful

C.      *Sentencing Error*

Williams contends, and the People agree, that the trial court erred in designating count 4 as the principal term and that Williams is entitled to an additional four days of presentence custody credit.  We agree as well.

The trial court selected count 4, assault with a firearm, as the principal term and imposed the three year sentence plus three years for the firearm use enhancement under section 12022.5.  The jury, however, found true the firearm use enhancements as to assault with a firearm on count 6, also assault with a firearm, not count 4.  Thus, the trial court should have designated count 6 and its enhancements, rather than count 4, as the principal term.[9]  We will modify the judgment to correct this error, which has no effect on the length of Williams' sentence.  (See *People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13 ["the appellate court can correct a legal error resulting in an unauthorized sentence . . . at any time"]; *People v. Menius* (1994) 25 Cal.App.4th 1290, 1294-1295 [appellate court can correct unauthorized sentence, such as a sentence where the trial court has applied an enhancement to the wrong count].)  Remand is not necessary because both count 4 and count 6 are the same: assault with a firearm.

In addition, the trial court awarded Williams 491 days of presentence custody credit, consisting of 431 days of actual credit and 60 days of conduct credit.  Under section 2933.1, subdivision (a), Williams was entitled to 15 percent of his actual credit as conduct credit.  Fifteen percent of 431 is 64, not 60.  He thus is entitled to an additional

---

analysis of the evidence and were not swayed the small portion of any objectionable testimony they may have heard.  (See *People v. Trinh* (2014) 59 Cal.4th 216, 253 ["[c]onsistent with our review of defendant's individual claims, we find no cumulative error occurred"]; *People v. Manibusan* (2013) 58 Cal.4th 40, 100 ["[t]o the extent there are a few instances in which we have found error or assumed its existence, no prejudice resulted"].)

[9]      Under section 1170.1, subdivision (a), "[t]he principal term shall consist of the greatest term . . . imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. . . ."  (*People v. Beard* (2012) 207 Cal.App.4th 936, 941, fn. 3.)

17

four days of conduct credit, and we will modify the judgment to correct this error.  (See § 1260; *People v. Chilelli* (2014) 225 Cal.App.4th 581, 591.)

## DISPOSITION

The judgment is modified to designate count 6 as the principal term and to impose three years on that term, plus one year for each of the two enhancements as to that term, and to impose a consecutive one year sentence on count 4.  The judgment is further modified to provide an additional four days of conduct credit, or 64 days, for a total presentence custody credit of 495 days.  As so modified, the judgment is affirmed.  The trial court is directed to prepare a corrected abstract of judgment and to forward a copy to the Department of Corrections and Rehabilitation.

SEGAL, J.*

We concur:


WOODS, Acting P. J.


ZELON, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18